# EXHIBIT A

Case 2:23-cv-08682-MWC-DMK   Document 191-2   Filed 01/19/26   Page 1 of 14   Page ID #:8303

# EXHIBIT E

Babakhanlou vs. Los Angeles County et al.; Case No. 2:23-cv-08682 MWC-JPR



**J.R. LAMBERT CORRECTIONAL HEALTH CONSULTING, LLC**

**1214 15th St.
Port Royal, SC 29935**

843-321-2003
jrlambertconsulting@gmail.com

Narine Mkrtchyan
Attorney At Law
Mkrtchyan Law Firm

**Re:   Edmond Babakhanlou vs. Los Angeles County etal.: Case No. 2:23-cv08682 MWC-JPR**

My name is Johnnie R. Lambert, RN, CCHP-A, HRM, LNC. I have been a Registered Nurse for over 50 years, with experience in Psychiatric Nursing, Cardiovascular Care, and Emergency Nursing. I have worked in Correctional Health for 28 years. I am a Certified Correctional Health Care Professional-Advanced (CCHP-A), recognized by the National Commission on Correctional Health Services. I have held a CCHP certification since 2004 and attained the Advanced Designation in 2019. I served on the Board of Trustees for the NCCHC CCHP Program for three years and continue to collaborate with the program as needed. I am a member of the American Correctional Nurses Association (ACNA) and the American Nurses Association (ANA). Currently, I am working with the ACNA to update the Scope of Practice and Standards of Practice for Correctional Nursing. I am a certified healthcare risk manager.

I began my career in correctional nursing in 1997 at Allandale Correctional Institution in South Carolina as an infirmary RN and have worked in multiple correctional facilities throughout the years. I have worked in both jails and prisons, large and small, with experience in direct care, health services administration, nurse training and education, and corporate-level management.

As a correctional health consultant, I continue to write policies and procedures for correctional facilities, work with providers on clinical guidelines for care, conduct training for nursing staff working in correctional facilities, and review legal cases.

I have been asked to review and give my professional nursing opinion on this case, with special attention to the care given while Mr. Babakhanlou was held in the Los Angeles County Jail. In order to complete this request, I have reviewed the following records:

1.  Deposition: Freddy Urias RN, taken on 3/13/25
2.  Deposition: Graciela Placenia LVN, taken on 3/17/25
3.  Deposition3: Hector Nery, RN, taken on 3/17/25
4.  Deposition: Mark Benor, MD, taken on 4/2/25
5.  Deposition: Janelle Peralta, RN, taken on 4/9/25
6.  Deposition: Edmondo Babakhanlou, taken on 3/31/25
7.  Defendant's Expert Report: Dr. Paul Adler, DO FACEP, 4/14/25
8.  BSCC California: Adult Title 15, Minimum Standards for Adult Local Detention Facilities
9.  BSCC California: Adult Title 24, Minimum Standards for Adult Local Detention Facilities
10. ADA Title II Regulations Supplementary Information: 28 CFR Part 35
11. American Diabetes Association: Standards of Medical Care in Diabetes -2020/2025
12. D-COLA USC Medical Records Summary
13. D-COLA USC Medical Records
14. Exhibit C – Expert Letter Document 123-6
15. Exhibit D- Expert Letter Document 123-7
16. County of Los Angeles : Correctional Health Services Policies and Procedures, Procedure 133.03, Insulin Administration
17. Jail Records Summary with Bates Stamped Pages
18. Medical Records: LA County Jail 5/2/22-

Babakhanlou vs. Los Angeles County et al.; Case No. 2:23-cv-08682 MWC-JPR

19.  Inmate total Movement History, LA County Sheriff's Department COLA 010661
20.  CHS Policy: Clinical Services #68.01
21.  Refusal Forms: 2022-2023
22.  Refusal Policy: Clinical Services #51.03
23.  Americans With Disabilities Act: Title II Regulations

Mr. Edmond Babakhanlou (Plaintiff) was booked into Los Angeles County Jail on 5/2/22 at 6:53 PM and released from custody on 10/1/23 at 9:41 AM. He was incarcerated for 517 days, with multiple hospitalizations during this time period. On admission, he was noted to suffer from Diabetes, type 2, with Insulin Control (long-acting Basaglar 45 units daily). His medical history also included hypertension, hyperlipidemia, diabetic neuropathy, asthma, substance abuse disorder, and obesity. The admission medical examination noted that the plaintiff had a small puncture wound on his back, healing from surgery approximately four (4) weeks prior to incarceration. He was being treated with antibiotics, but it was noted that there was no evidence of infection at the time. The examining provider, Dr. Wind, changed him from the long-acting insulin to a combination of long-acting and short-acting insulin, which was administered 3 times per day before meals. The administration times were 5 AM, 1030AM, and 4 PM, with other oral medications given at 8 AM. She additionally ordered blood-sugar monitoring (BGM), a transfer to diabetic housing (8000 unit), and daily wound care. Upon transfer, the plaintiff was placed in the diabetic "dorm" which housed 30-40 patients in an open area with bunk beds. Mr. Babakhanlou was ambulatory at the time of his initial admission to the facility with no abnormal gait, pain, or complaints. Upon transfer to the diabetic housing, he was to receive a diabetic diet and regular monitoring of his blood sugars.

During his initial stay of five (5) days (5/2-5/7/22) on the 8000 unit, 13 refusal forms were completed by nursing staff for BGM and insulin doses.

On 5/2/22, the provider cultured the healing wound on the plaintiff's back and results on 5/6/22 demonstrated a MRSA[1] infection of the wound. The plaintiff was then transferred to an isolation room for treatment of this infection, where he remained until 5/20/22. He continued to receive wound care until 5/29/22, with very few (4) refusals of treatment. On 5/31/22, his blood glucose monitoring read 450/470 at 5AM; Nurse Urias notified Dr. Ridgill, and was told to recheck blood glucose at 7:30AM and encourage the patient to drink fluids. The recheck was never done. At 6PM, plaintiff's BGM reading was 503, which is a critically high glucose reading (normal range for a diabetic fasting is 80-130 mg/dl, and 1-2 hours after meals <180 mg/dl). There is no documentation of a provider notification for this BGM reading.

On 6/2/22, there began a pattern of refusals for 5 AM insulin and BGM. There are refusal forms, unsigned by the patient, daily, usually for the 5 AM, 8 AM and 1030 AM medications and insulin administration. Many of these forms were pre-typed "refused to sign" and then co-signed by a deputy and a nurse, or by two nurses.[2] Refusal forms were completed daily by nurses/deputies without the patient's signature. Between 6/2 and 12/18/22, there were 294 refusals of care within 200 days; unsigned by the patient but signed by nurses and /or deputies.

During this time period, the plaintiff was housed on the diabetic unit where he was to be monitored. Nurses deposed who obtained these refusals stated that they did not enter the dorm area of the unit due to "safety concerns" and accepted the deputy's confirmation that the patient was refusing medication or treatments. On 7/13/22 Mr. Babakhanlou was taken to the urgent care unit at CTC for complaints of lower chest pain/ribcage pain. He was diagnosed with "left chest rib pain- likely muscular" and returned to the dormitory. He continued to complain of increasing chest pain, but no further treatment was offered. His diabetes treatment was managed by the Pharmacist, Cindy Lin, who frequently documented that he was "compliant for the most part" with treatment.  By 12/18/22, the plaintiff was having difficulty walking due to pain, which was then described as severe back and bilateral flank pain. After assessment by urgent care,  Mr. Babakhanlou was sent to LCMC for evaluation of severe back and bilateral rib pain with difficulty ambulating. He was admitted to the hospital with a diagnosis of diabetes mellitus type 2, hypertension, ventral spigelian hernia, flank and back pain, and sepsis due to Klebsiella infection.

---

[1] Methicillin-Resistant Staphylococcus Aureus: This infection is frequently acquired in prison and jail facilities where there is close contact and insufficiently sanitized areas. People who are IV drug users and those with diabetes are highly vulnerable to MRSA infections.

[2] See "Refusal Forms 2022-2023.

**Babakhanlou vs. Los Angeles County et al.; Case No. 2:23-cv-08682 MWC-JPR**

On return, 12/22/22 he was then housed in the men's central jail. During this time he consistently complained of lower back pain and generalized body aches with difficulty walking, sometimes having to crawl to receive his food trays.

On 12/28/22 he began to have intractable back pain and was unable to walk to the bathroom, not eating, not having bowel movements. He was again sent to LCMC for evaluation, with concern for L4/5 discitis and probable osteomyelitis, consistent with infection, severe central canal stenosis, presacral edema/phlegmon, joint inflammation and synovitis, multifocal pneumonia, left psoas abscess, acute cholecystitis, potential stercoral colitis.

During this stay, he was scheduled for a laminectomy due to the progression of the infection, development of a spinal abscess and a left psoas (muscle) abscess, which was cancelled due to a distended abdomen and Revised Cardiac Risk Index. Instead of surgery, he was treated conservatively with antibiotics, pain management, and a bowel regime, and returned to the jail on 1/13/23.

Upon return to the facility he was housed in the Twin Towers facility (Infirmary) for care. His mental status declined and he suffered a self-inflicted traumatic removal of foley catheter on 1/16/23; he was sent to LCMC Emergency department for treatment. Upon his arrival at the hospital, he was diaphoretic, with low blood pressure and confusion. He was treated and returned to the infirmary with a newly placed catheter on 1/17/23. The plaintiff had two subsequent hospitalizations, from 2/23/23 to 3/2/23 due to significant back pain and difficulty ambulating more than a few steps. His CT scan was suspicious for infection/phlegmon[3], and cystitis; but there was no surgical intervention; he continued to be treated with antibiotics. The providers recommended aggressive pain management, but he became confused from medication given at the jail. On 3/20/23 he was again sent to the hospital due to increasing pain, confusion, and potential recurrent or worsening confusion. He remained in hospital until 4/1/23. He was housed in the infirmary until 4/4, when he was transferred to the 7100 unit of the jail (medical housing).

During his stay in the infirmary (1/16-4/4/23), there were 10 refusal forms completed by nursing, not signed by the plaintiff. Three of the refusals were for BGM/Insulin, and 7 for lab draws.

He remained in the 7100/7200 unit until 4/26/23, when he was again moved, this time to general population (non-medical, non-ADA compliant). He remained in general population until 6/26/23, when he was moved back to the 7100 unit. During this time, there were a total of 10 refusals (unsigned), nine of which were for vital signs or blood pressure checks. There was only one refusal for blood glucose monitoring.

From 6/26 through 8/8/23, he was housed in the 7100 unit, and accumulated a total of  5 unsigned refusals of treatment. Two of these were for lab tests, 2 for BGM, and one was for clinic, due to leg pain.
On  8/4/23, he was again sent to the LCMC Emergency Department for evaluation of urinary incontinence and back pain radiating to the left lower leg. He returned to the jail on 8/8/23 and was again placed on the 8000 (diabetic) unit. There are 71 unsigned refusals in the record from 8/9/23 through his release on 10/1/23.

**Opinion on Care Rendered:**

Mr. Babakhanlou came into the facility ambulatory, with no complaints, with a history of recurrent infections possibly due to his previous IV drug use and diabetes. Having had a previous procedure 4 weeks prior to arrest, he was still receiving dressing changes and antibiotics for treatment of a back wound.

His condition deteriorated significantly over the course of the 517-day confinement in the jail.  He went from ambulatory, periodically working in the jail, to wheelchair dependent and mentally confused. He was on a daily dose of long-acting insulin when admitted, but was changed to the jail-scheduled dosages, which were a tremendous change from his home routine. Although this is not unusual when a jail changes medications and administration times, it has a significant impact on the overall well-being and compliance of the patient.

---

[3] An inflammation, usually caused by a bacterial infection that affects the soft tissues of the body. This can keep spreading and affect internal organs, causing pain and disruption of organ function.

Babakhanlou vs. Los Angeles County et al.; Case No. 2:23-cv-08682 MWC-JPR

His placement on the diabetic unit was meant to enhance his access to care and monitoring as a diabetic patient, however, he was not properly monitored while on the unit, primarily due to the nursing staff reluctance to enter the dormitory housing area to provide care. The deputies also did not summon medical help when it was requested by the plaintiff, causing him further discomfort, and interfering with his access to care (Babakhanlou Deposition p. 36)

**Access to Care:**

Access to care is the underlying reason for health standards throughout the jail and prison systems. The heath authority must identify and eliminate any unreasonable barriers to care that is rendered in a timely manner. The patient is to be seen by a qualified health care professional, be rendered a clinical judgment, and receive care that is ordered, including the following:

- Unreasonable barriers to health services are to be avoided.
- Having an understaffed, underfunded, or poorly organized system, with the result that it is not able to provide appropriate and timely access to care
- Security staff do not interfere with the patient's access to care, and there is adequate security staff to ensure that this process occurs.

The nurses' reluctance to enter the dorm and determine the reasons for the patient's "refusals" and their reliance on verbal reports from the security staff indicate either a lack of adequate security, or a deliberate indifference to the patient's needs.

Mr. Babakhanlou also reported that he complained to the deputies several times a day, especially as his condition deteriorated, but this information was not documented as having been conveyed to the medical staff until and unless there was a very severe exacerbation of his symptoms. He stated that he was unable to directly speak with nursing staff, but had to go through deputies for every request. This is a violation of patient privacy, Access to Care standards, and multiple other national standards for correctional health care.

**Refusals:**

Although the facility policy is clear that the patient must refuse care in person to the nurse after education is provided[4], nurses failed to obtain in-person refusal, but by their testimony, relied on deputies to obtain a verbal refusal and documented without attempting to speak with the patient. Depositions reveal that it is a pattern that occurs primarily in the diabetic dorm. The volume of unsigned refusals is tremendous. The fact that many of these refusals were stamped "Patient Refused to Sign" shows that nurses anticipated in advance that there would be refusals. It is significant that over 423 refusal forms were in the medical record with 95% of them completed on the 8000 unit. This demonstrates a pattern of care on the diabetic unit that normalizes refusals of care.

Patients have a right to refuse care at any time if they are competent to make this decision, however, there are criteria listed in the policy that exempt this; criteria #4: "Exhibits signs and symptoms of potential mental changes that may impair his ability to make a decision, i.e. slurred speech, non-responsive, non-sensical speech or words." etc. The policy states that "patients refusing medication are required to be brought to the centralized pill call area for multi-man living situations (dorms) and cell/bar front for single man living situations. If the patient responds to health-care personnel and indicates that they are refusing medication, a refusal form will be completed." Mr. Babakhanlou was not brought to the nurse to verify refusals, and did not speak with health-care personnel. The excessive number of unsigned refusal forms, especially on the 8000 unit and the existence of over 90 "pre-signed" forms (typed in "Pt. Refused to Sign" or stamped "Declined") demonstrates an indifferent attitude toward necessary patient care.

---

[4] County of Los Angeles, CHS Policies and Procedures: Clinical Services 51.03

Babakhanlou vs. Los Angeles County et al.; Case No. 2:23-cv-08682 MWC-JPR

There are several notes in the chart, early in his incarceration, that state that he worked (in the jail) on the night shift, and was asleep during the 5AM insulin pass, and at 10:30. The time of the insulin administration made it difficult for him to function when awakened at this time. On 10/13/22, the pharmacist went into the dorm with custody to discuss his refusals to attend clinic. At that time, the plaintiff stated that he works for night shift, and therefore was too tired to wake up for 5AM BGM and 10AM long-acting insulin doses. The long-acting insulin dosage was subsequently adjusted so that he could receive it at the 4 PM insulin line instead of at 5AM (Bates page 1961, Jail Medical Records).

Nurses continued to complete refusal forms for 5AM BGM even after the insulin time was changed.  In my professional opinion, this shows that the nurses adhered to a rigid schedule and did not review medical notes or take into consideration the patient's needs. In fact, they did not speak with the patients who were refusing monitoring or insulin due to their "fear" of entering the unit, instead passing along a "chart review" notice to the provider.

It is not true that the plaintiff refused to participate in his care; he was unable to participate due to multiple reasons, chronic pain, work schedule, and not being given the opportunity to discuss medications with nursing staff. He stated that he was only able to speak with deputies, and not nursing staff when voicing his concerns.

**Deterioration of Health:**

The plaintiff entered the facility with a history of diabetic neuropathy, and this appeared to worsen during his incarceration. He began to complain of severe back pain and difficulty walking, and was sent to the hospital several times with findings verifying his complaints. Although his HbA1c improved over time, his blood glucose, when obtained, remained outside of normal limits for a diabetic patient. The hospital recommended that he be followed by an endocrinologist for his condition, as is the standard recommendation  when the HbA1c and spot glucose readings conflict, but he was never referred to endocrinology from the jail.

He developed recurring and persistent infections and had multiple courses of antibiotics, eventually being diagnosed with kidney injury, septicemia, chronic intractable lower back pain, paravertebral soft tissue inflammation concerning for discitis, and probable osteomyelitis. These are very serious conditions which would cause the patient to have severe pain. He had difficulty urinating and was given a foley catheter. By December of 22, he required a walker to ambulate. He was again sent to LCMC due to intractable pain and was finally moved to infirmary housing in January of 2023.

Blood glucose readings in the jail medical health record varied from a low of 137 mg/dl on in August of 2022 to over 500 (5/24/22) with the majority of the readings in the 200-400 range.  Critical high blood sugars were addressed by advising the plaintiff to drink more water and referring to the provider. Repeat readings ordered by the providers, usually 2 hours after the high readings, were not completed by nursing staff.

**Deterioration of Mental Status and effect on Condition:**

While in the infirmary, he became extremely confused and delirious, and the resultant action by jail staff was to remove the bed from his room.  This forced the plaintiff, who was already in pain, to now sleep on a thin jail mattress on the floor. He remained on the floor until at least 1/31/23.  The facility did not properly manage the plaintiff's mental state, and removal of his bed, probably causing more pain for the plaintiff, was not the solution to his issue. This amounted to punishment because of the plaintiff's altered mental status.

Mr. Babakhanlou states in his deposition that he enjoyed the dorm situation because there was TV and other people to talk to. This activity may have kept his mental acuity stable. When placed in a single cell situation, without outside stimulus, his mental status deteriorated.

There is no documentation found from 1/31 through 2/4/23, when he was taken to the doctor for a visit in the wheelchair. Being forced to sleep on a mattress on the floor would have aggravated his pain. By February of 2023 he was unable to transfer to his walker or walk due to left leg spasms and pain. He was then ordered a wheelchair of his own.

Babakhanlou vs. Los Angeles County et al.; Case No. 2:23-cv-08682 MWC-JPR

Mr. Babakhanlou was released from LCMC after a stay from 3/20 to 4/1/23. He was incorrectly diagnosed (chart error?) with HIV related encephalopathy, although he is not HIV positive. This was corrected in the LCMC medical record. He remained with a diagnosis of c-spine infection, boney destruction, discitis. Buprenorphine was recommended for pain management, (not for detoxification or substance abuse maintenance) along with Lyrica, antibiotics, Tylenol, Robaxin, and lidocaine gel for pain management. It was recommended that he receive sublocade injections (once monthly buprenorphine) in the jail.

**Improper Level of Care/Housing Placement:**

The plaintiff's persistent pain and other medical issues required more care than he was receiving at the jail. A general population placement did not afford him the monitoring required for his status as an insulin-dependent diabetic with multiple serious co-morbidities. The 8000 unit was not ADA compliant, and the patient experienced difficulty getting meals and medications. Even when in single cell, he was often forced to crawl to receive his food. According to his testimony, he was working during the first 4 months and very tired, and being awakened to receive insulin and medications at 5 AM was very difficult for him. He did not personally refuse any medications.

**Lack of Diabetic Monitoring:**

When he was housed in the diabetic unit "for monitoring" he was not monitored by nursing staff, but by security staff, who are untrained in the medical aspects and possible complications of severe diabetes. His pain caused him to miss medication lines, insulin administration, and appointments. Although his chart was "flagged for review" by providers, there was not much change implemented to address his issues, other than sending him out to the emergency department periodically for acute symptoms. This shows a level of indifference to Mr. Babakhanlou's medical needs. If a patient's medical condition requires monitoring, he/she should be placed in a setting where staff is accessible. The access to care for the individuals housed in the diabetic unit was limited to those patients who were able to quickly ambulate to the pill window when called, or who were in single cells that nurses approached for medication administration or treatments.

A patient with multiple co-morbidities accompanying diabetes, difficulty walking, difficulty performing self-care, and difficulty with bowel and bladder control is not a good candidate for dorm-style housing. Given the patient's inability to comply with the scheduling of the jail, and his overall deterioration over time, appropriate placement in a medical unit with direct observation would be recommended.

It is notable that the majority of the refusals of treatment were obtained in the 8000-housing unit. When the plaintiff was housed in the infirmary, 7000, or even general population, there were comparatively minimal refusals of care. This implies that there is a problem with the overall policies of the 8000 unit. If the unit is not rendered safe for medical staff to enter and evaluate patients, and limits the patient's access to necessary care, persons such as Mr. Babakhanlou should not be housed there.

I was unable to review Medication Administration Records for comparison as they were not provided by the defendant.

**Lack of Quality Improvement:**

I found no evidence of Quality Improvement studies or any tracking of the refusal forms. The sheer volume of refusals is a red flag indicating a need to review the policies, procedures, and barriers to care in a facility. Quality improvement studies are a means to objectively review all aspects of healthcare in a correctional facility, and are required by most accrediting and licensing agencies. A study of the patterns of refusals in this case, might point to needed improvements in the structure of care given in the facility. Adult Title 15 Minimum Standards §1202 requires development and implementation of a written plan for annual statistical summaries of health care and pharmaceutical services that are provided. The standard also requires a plan for correcting identified deficiencies in healthcare and pharmaceutical services delivered.

**Lack of Treatment Plan:**

Standards §1210 also specifies that if special accommodations or a schedule of follow-up care is needed during the period of incarceration, responsible healthcare staff must develop a written treatment plan. A treatment plan involves security, nursing, medical providers, mental health, and, if necessary, administration. In the plaintiff's case, a special treatment plan may have assisted him with adherence to glucose monitoring or insulin schedule. Although medications were monitored by the Pharmacist and education was provided by the pharmacist, there is no evidence of a multidisciplinary treatment plan to address the needs of the individual and others in the diabetic unit.

**Previous Depositions Given:**

7/24/25: Raheem Peterkin v. Victor Hill and CorrectHealth Clayton, LLC
        Civil Action: 1:24-cv-01945-ELR (Ga.)

**Conclusion:**

It is my professional opinion that Mr. Babakhanlou did not receive adequate nursing care while in the custody of the LA County Jail. His gradual deterioration over time demonstrates that he was not a good candidate for a dormitory-style housing unit, and the nurses' testimonies showed that they did little to no monitoring of patients housed in the unit. The refusal process is not followed, and nurses frequently did not discuss the refusals with patients, instead pre-preparing refusal forms.

Even after the service of Expert Medical Opinions and requests for his compassionate release, he was forced to remain in custody and suffer from his multiple illnesses. His condition required frequent visits to the Los Angeles County Medical Center and treatment by a variety of specialists, but his medical and mental health continued to deteriorate throughout his incarceration.

Nursing staff were not familiar with, or ignored the policies of the LA County Jail, and were not familiar with the Title 15 Adult Detention Standards. This demonstrates a lack of training of medical staff in the care of the incarcerated person, especially persons with chronic, debilitating illnesses.

Although dormitory-style housing is designated for non-violent detainees, nurses expressed concern for their safety and felt this was adequate reason to disregard refusal policies. This represents a failure of coordination between security and health staff, and heightens suspicion of inadequate security staffing.

Jail space is at a premium, as jails have become the largest mental health institutions in the country. The incarcerated population grows sicker, come in lacking previous healthcare, and present more complicated diagnoses compounded by the prevalence of drug usage; yet jails are required to provide a constitutional level of care and must adapt to the needs of the population.

The opinions stated above are based on my 50 years of registered nursing experience and training, and 28 years of correctional health care. I reserve the right to modify this report based on any newly provided information.

Johnnie R. Lambert, RN, CCHP-A, LNC, HRM

8/7/2025

*Johnnie R. Lambert RN, CCHP-A, LHRM*
*1214 15th St.*
*Port Royal, S.C. 29935*
*Phone: 843-321-2003*
*jrlambertconsulting@gmail.com*

## CORRECTIONAL HEALTHCARE CONSULTANT

50 years of experience as a Registered Nurse with extensive management background, as well as clinical expertise in the areas of mental health, acute care, and correctional healthcare. Conducted reviews and formulation of action plans required by consent decrees and/or settlement agreements, and monitoring of adherence and corrective action. Experienced policy writer, contract monitor, and nursing care evaluator.

**J.R. Lambert Correctional Health Consulting, LLC**
**December 2019 – Present**

- Legal Nurse Consultant: Review, summarization, analysis of medical records. Assist with discovery,  analysis of medical staffing, medical records, standards of care, research and analysis of information, written summary reports. Consulting expert for correctional healthcare litigation and jail/prison legal actions.
- Support implementation of electronic health records and modification to meet jail/prison standards.
- Interpretation of contracts and proposal writing
- Train medical staff in legal and clinical aspects of correctional health care.
- Health Care Risk Management: perform risk assessment and mitigation plans for facility programs.
- Multi-State RN Licensed (SC-Base)
- Consult with Correctional Healthcare providers in areas such as staff development and training; policy and procedure development and implementation; medical auditing; risk management; proposal writing; research and review of standards, regulations, and laws pertaining to correctional healthcare; clinical reviews; and other tasks as requested.
- Currently working with National Commission on Correctional Health Care  (NCCHC Resources, Inc.) on program development. As Advanced CCHP, screen applicants applying for this certification.
- Write Policies and Procedures for correctional healthcare
- Member of American Correctional Nurses Association, currently in workgroup revising Correctional Nursing Scope and Standards of Practice.

**Centurion, LLC**
**Vienna, Va. 22182**
**Policy and Accreditation Coordinator**
**Clinical Operations Specialist**
**May 2015 – December 2019**

- Wrote and revised policies, procedures, nursing treatment manuals, and  created training programs for Correctional Nursing Management
- Developed training modules for nursing staff upon request of Training Director; worked closely with Chief Nursing Officer, Director of Training, Director Infection Control, Director of Operations, and Sr. V.P of Operations in development and training of staff
- Researched and reviewed standards of correctional healthcare, local regulations, and state laws for contract compliance and new business
- Monitored contract compliance for Centurion/MHM Contracts; supported and trained site managers in CQI, policies, nursing supervision, correctional healthcare procedures, and systems

**Armor Correctional Health Services, Inc.**
**Miami, Florida 33155**
**August 2005 - May 2015**

Johnnie R. Lambert, RN, CCHP-A, LHRM, LNC

1

*Johnnie R. Lambert RN, CCHP-A, LHRM*
*1214 15th St.*
*Port Royal, S.C. 29935*
*Phone: 843-321-2003*
*jrlambertconsulting@gmail.com*

**Vice-President, Policy & Accreditation**

- Wrote and revised  policies, procedures, nursing treatment manuals, training programs for Directors of Nursing, and other nursing personnel.
- Evaluated and monitored  Armor systems compliance with appropriate accreditation and evaluation bodies such as ACA, NCCHC, State Reviews, Department of Justice Reviews;
- Conducted training and provided support for Armor healthcare site personnel in policies, procedures, standards
- Assisted in the development and implementation of ongoing Continuous Quality Improvement Programs;
- Assisted in preparation of bids, contract reviews, and responses to RFP's
- Communicated with Armor clients concerning healthcare systems and compliance with standards;

**Correctional Medical Management, LLC**
**Nashville, Tennessee, 37212**
**March 2004-July 2005**
**Director of Clinical Operations**

- Evaluated and monitored all prisons in State of Alabama for compliance to consent decrees and settlement agreements in place. Reviewed medical records, interviewed staff and patients to ensure compliance with NCCHC, ACA standards, and requirements of DOJ settlement agreement (*Leatherwood v. Campbell etal.::2004)*
- Worked with Southern Poverty Law Center on monitoring of settlement agreement (*Gaddis v. Campbell, USDC Middle District Alabama :: 2004);* reviewed records, toured sites, and documented compliance with agreement.
- Monitoring of contractual health care services for correctional facilities
- Preparation of reports
- Review and Analysis of medical records for legal proceedings concerning adherence to settlement agreements and national standards of care
- Provided management training and support for correctional medical staff in contracted facilities.
- Evaluated and directed implementation methods for improving operational efficiency, effectiveness, cost-effectiveness in facilities

**Correctional Medical Services**
**February 1997-March 2004**
**St. Louis, Missouri**

- ✸ **DeKalb County Jail, Decatur Ga.**
  **Health Service Administrator, Feb. 2003-March 2004**
  Overall administration of healthcare unit in large county jail with over 3000 inmate population
  - Managed medical staff of over 117 FTE
  - Management of $11 mil/annum budget for healthcare
  - Monitored of provision of care within the requirements of settlement agreement; assisted Sheriff's department in ending the settlement agreement period and worked with an appointed court monitor. (*Dorsey v. Adams:: 2001)*

- ✸ **Duval Pre-Trial Detention Facility, Jacksonville, Fl.**
  **Health Services Administrator; May 2001-Feb. 2003**

  - Managed 3000 bed county jail medical unit with approximately 103 employees.
  - Maintained and audited  medical records

Johnnie R. Lambert, RN, CCHP-A, LHRM, LNC
2

*Johnnie R. Lambert RN, CCHP-A, LHRM*
*1214 15th St.*
*Port Royal, S.C. 29935*
*Phone: 843-321-2003*
*jrlambertconsulting@gmail.com*

- Provided education and training for nursing and other professional staff
- Interpreted and monitored adherence to Standards of Care
- Compiled and reported medical statistics
- Acted as liaison between correctional staff and medical staff
- Supervised and implemented adherence to OSHA, National Committee for Correctional Health Care, American Correctional Association, and American Nursing Association standards.
- Assisted in preparation of annual budget for healthcare

✳ **South Area Regional Administrator; February 2000-May 2001**
   **Correctional Medical Services**

- Supervised medical services in prison facilities in South Carolina, Florida, and Virginia
- Assisted in budget preparation and management of financial performance of contract sites.
- Monitored for contract compliance and continual evaluation of applicable penalty issues
- Trained and mentored site managers

✳ **Site Administrator: Lee Correctional Institution; Mar. 1999-Feb. 2000**
   **Bishopville, S.C.**

✳ **Director of Nursing: Lee Correctional Institution; Dec. 1998-Mar. 1999**
   **Bishopville, S.C.**

✳ **Nursing Supervisor: Allendale Correctional Institution; March 1998-Dec.1999**
   **Allendale, S.C.**

✳ **Psychiatric Nurse Manager: Allendale Correctional Institution; Aug. 1997-Mar. 1998**
   **Allendale, S.C.**

✳ **Staff Nurse: Allendale Correctional Institution; Feb. 1997-Aug. 1997**
   **Allendale, S. C.**

OTHER ACTIVITIES

- 2015-2021: Lead Surveyor, NCCHC
- 2016-2021: Member of CCHP Board of Trustees (NCCHC-3-year terms)
- Present: Member Board of Directors – Health through Walls (501c3)
- 2019-Present: Consultant to NCCHC Resources, INC. (NRI)
- 2009-2010 Consultant – Contributor to Essential Learning, LLC (now Relias Learning, Inc.) Research and develop online training programs for correctional facility medical and security staff
- Member: International Association of Forensic Nurses
- Member: American Correctional Association
- Member: American Alliance of Legal Nurse Consultants
- Member: American Correctional Nurses Association

PUBLICATIONS:

**Developed for Essential Learning, LLC**:

*Johnnie R. Lambert RN, CCHP-A, LHRM*
*1214 15th St.*
*Port Royal, S.C. 29935*
*Phone: 843-321-2003*
*jrlambertconsulting@gmail.com*

- Intoxication and Withdrawal for Correctional Officers; June 2009
- Grief and Loss for Correctional Officers, July 2009
- Special Needs of LGTBQI Inmates, September 2009
- Confidentiality of Health Information in Correctional Facilities, December 2009

**Developed for Turn Key Health, LLC (2015-2016)**
- Training- Suicide Prevention in Corrections
- Bloodborne Pathogens Training
- Medical Information for Correctional Officers
- Medical Orientation for Correctional Health Staff
- Compassion in Correctional Nursing

**Presentation: NCCHC**
- Psychogenic Non-epileptic Seizures: What are They and How do We Manage Them.  Presented with Dr. Rebecca Vauter, PsyD. ABPP, CCHP-MH, 5/21

**Book Review/Edit:**
- Correctional Health Care Patient Safety Handbook. Lorry Shoenly PhD, CCHP-RN. 2014

**EDUCATION and TRAINING:**

- Institute for Prevention of In-Custody Deaths: Certified as Agitated Delirium /Agitated Chaotic Events Instructor
- NCCHC Certified Correctional Health Professional - Advanced 18 years; NCCHC Lead Surveyor
- University of Florida – 2008: Licensed Healthcare Risk Manager
- College for Professional Studies: Nurse-Paralegal (2002-2003)
- Medical-Legal Consulting Institute Inc.: Certified Legal Nurse Consultant (2002)
- Management and Leadership Development Program, Correctional Medical Services; Certified as Correctional Healthcare Manager (1999)
- Cleveland State University (1975-78)
- University of South Alabama (1971-1973)
- Mobile Infirmary School of Nursing: Mobile, Alabama (1971-1974)
- Licensed in the State of South Carolina (Multi-State License)
- South Carolina Notary Public Exp. 2025

**Technical Skills:**
- Microsoft Office 365 (Word, PowerPoint, Excel, Visio, SharePoint)
- Adobe Acrobat
- SuperUser with Sapphire EMR, CorEMR (Electronic Health Records)



**J.R. LAMBERT CORRECTIONAL HEALTH CONSULTING, LLC**

**1214 15th St.**
**Port Royal, SC 29935**

843-321-2003 ☎
jrlambertconsulting@gmail.com ✉

## Consulting Fee Schedule

| | |
|---|---|
| **General Record Review for Merit Medical Records Reviews** | $250 per Hour, billed in 15-minute increments |
| **Written Reports, Telephone Consulting Research – non-testifying** | $250 per hour, billed in 15-minute increments |
| **Legal Testimony Depositions** | $400 per hour, full day fee (8-hour) |
| **Policy and Procedure Manuals/Updates Nursing Protocols/Updates Other Support** | $250 per hour |
| **Correctional Staff Training (Medical/Security)** | $250 per hour |
| **Travel** | $250 per hour, 2 hours minimum will be billed |

**Billing:** Invoices will be issued monthly; payment is due within 10 days of receipt, electronic payments preferred.

**Retainer:** $1500 on contract commencement

**Travel Expenses:**

- Air travel, parking, ground transportation to/from airport, baggage, handler tips and fees
- Meals, lodging, parking, gas mileage, auto rental
- If overnight stay is required, billing will be for 8 hours per day plus travel time
- Travel will be billed from door to door, with 2 hours minimum
- Travel expenses and lodging requested in advance, unless other arrangements are made

**Other Requests:** $250 per hour, on agreement of both parties

**Johnnie R. Lambert, RN, CCHP-A, HRM, LNC**
**Owner**